UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 07-21093-CIV-KING

JOHN JAFFE &
BARBARA JAFFE,

      Plaintiffs,

v.

BANK OF AMERICA, N.A. &
AGRICULTURAL BANK OF CHINA,

      Defendants.

_____/

**OPINION**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.    PROCEDURAL HISTORY**

The original Complaint filed by John Jaffe and his wife, Barbara Jaffe on April 24, 2007

sought a Temporary Restraining Order and Injunctive Relief against a single Defendant, Bank of

America, N.A. (BoA).    Plaintiffs sought an immediate emergency hearing to enjoin the

Defendant BoA from paying an irrevocable standby letter of credit in the amount of

$6,030,500.00 to either FoShan Polymarine Engineering Co., Ltd. (FoShan), a Chinese yacht

construction company or to the Agricultural Bank of China (ABC) on April 25, 2007.

The Plaintiffs alleged in their Verified Complaint that they had requested and authorized

issuance of the letter of credit by BoA to pay for the Jaffes' purchase of a luxury motor yacht to

be built in China by FoShan. Plaintiffs further alleged that, although the contract with the

shipyard provided for the vessel to be completed by June of 2006 and delivered to Plaintiffs in

Miami, Florida, the FoShan shipyard had ". . . never even commenced work on the vessel and it

was not completed by June of 2006. Accordingly, presentment of the letter of credit buyer on behalf of FoShan would be fraudulent and honor of the presentment would facilitate a material fraud by FoShan on Plaintiffs." They further allege that FoShan had ". . . provided the letter of credit to its bank Agricultural Bank of China (ABC), as security for debts unrelated to the Jaffe project."

Plaintiffs asserted, and their counsel argued, that the Chinese boatyard (FoShan) and ABC were conspirators to acquire by material fraud from Mr. and Mrs. Jaffe, funds intended by the Jaffes for payment for the purchase of a luxury yacht that had never been built. Unless emergency injunctive relief was immediately entered by the Court, Plaintiffs asserted that the $6 million would vanish into China, beyond the jurisdiction of this Court.

In support of their request for an injunction, Plaintiffs also filed an Emergency Motion for a Temporary Restraining Order (DE #3) and an Emergency Motion for Hearing (DE #4). Plaintiffs attached an affidavit from Peter Tsou (DE #3-2), the President of Custom Marine International (CMI), the seller in the yacht sales agreement, stating that the letter of credit existed, that FoShan had not commenced constructing the yacht, and that Tsou had notified ABC that the letter of credit should be terminated immediately. Also attached was the affidavit of John Robert Newton (DE #3-3), Plaintiffs' yacht broker, attesting to the contract between the Jaffes and FoShan for the building of the yacht, and an affidavit from Arthur Barbeito (DE #3-4), the engineer in charge of approving the construction plans, attesting to the existence of the construction contract and that he had not received the vessel's engineering schematics for his approval.

On April 27, 2007, this Court granted Plaintiffs' Motion for Hearing (DE #8), noting that Plaintiffs' controversy appeared to be with FoShan, and that BoA appeared to be an innocent

2

bystander. Thus, this Court ordered a hearing on May 3, 2007 for the purpose of allowing BoA, FoShan, and ABC to clarify their positions in the matter. Plaintiffs then filed a Supplemental Memorandum (DE #9), attaching an email correspondence showing that Plaintiffs' counsel informed BoA of the May 3 hearing, but that BoA would not be appearing (DE #9-2). Plaintiffs' counsel also detailed attempts to notify FoShan, by fax and email, of the hearing.

On May 2, 2007, Plaintiffs filed an affidavit from Michael Moore (DE #10), Plaintiffs' counsel, declaring that Plaintiffs had attempted to secure a performance bond with a company named Allianz for Plaintiffs' financial protection in the yacht transaction. The affidavit noted that the performance bond obtained from Allianz was subsequently determined to be fraudulent. Allianz was being investigated by the FBI for issuing fraudulent performance bonds. Plaintiffs also attached a signed letter from Xu Wei, General Manager of FoShan, stating that Peter Tsou was empowered to sign yacht construction contracts on behalf of FoShan (DE #10-3). An affidavit of John Jaffe (DE #11-2) declared that BoA had assured him that the letter of credit would not be honored until the yacht construction was completed.

Although noticed, BoA did not attend the Court's scheduled May 3, 2007 hearing. Only the Plaintiff, John Jaffe, and his counsel appeared. Mr. Jaffe testified that he was the victim of a fraud committed by this Defendant Bank in a conspiracy to unlawfully obtain $6 million from him for a boat that was either (a) never built, or (b) if built, sold to others who had vanished with it.

With ABC and FoShan ignoring the Court's Order to appear and defend themselves against the Plaintiffs' sworn assertions of fraud, the Court had before it only an uncontradicted record which appeared to entitle Plaintiffs to the temporary injunctive relief sought. It later developed (after ABC and BoA finally appeared and defended themselves) that Mr. Jaffe and his

counsel had been informed by the only then Defendant (BoA) that it would not object to Plaintiffs seeking a temporary injunction preventing payment to the beneficiaries of the letter of credit.[1]

The Court then entered an injunction preventing BoA from dispersing any funds pursuant to the letter of credit, directing Plaintiffs to immediately notify both BoA and the other two named alleged conspirators (ABC and FoShan) of the entry of the Court's injunctive order, with directions to respond to these serious charges within thirty days. On May 4, 2007 (DE #13) as the Court anticipated, the entry of the injunctive order on May 4 brought ABC into this litigation defending itself against the serious charges brought against it, as well as galvanizing BoA into defensive action.

On May 25, 2007, BoA filed a response with attached emails and faxes showing that they had been attempting to notify ABC, telling ABC that BoA could not represent them in the matter, and advising them to retain local counsel and enter an appearance (DE #14, 14-11, 14-12, 14-13). On May 31, 2007, BoA requested a hearing (DE #17), claiming that it wished to present documentary evidence which was in its possession prior to the Court scheduled temporary injunction hearing at which BoA had failed to appear on May 3, 2007. This Court denied the request on June 1, 2007 (DE #18), and directed Plaintiffs to respond to BoA's response.

On June 1, 2007, ABC finally appeared[2] by moving to vacate the preliminary injunction (DE #19), attaching an affidavit of Zhenjiang Zhang (DE #21), the New York Representative of

---

[1]  Mr. Jaffe testified on direction examination at trial that he informed Mike Evans at BoA that the boat was never built, and Mr. Evans told him that BoA would not oppose his application for the TRO: "[Evans] says you got to get your lawyer to get you a restraining order. And at that point he said, and if you do, Bank of America will not oppose your application for a restraining order." (June 29 Tr. 121:4-7).

[2]  Plaintiffs had not yet, at this point in the case, formally named ABC or FoShan as defendants. It was on August 3, 2007 that Plaintiffs' Amended Complaint first sued ABC and FoShan.

ABC, outlining ABC's position that it had relied on the letter of credit from BoA in making a loan to FoShan, and that the letter of credit should be payable immediately upon demand by ABC. On June 8, 2007, BoA filed its Answer denying the material allegations and asserting a counterclaim against the Jaffes and third-party claims against ABC and FoShan, seeking a declaration of its rights and obligations with respect to each party (DE #24).

This Court then made every effort to schedule a prompt hearing with all parties present to determine whether to consider Defendants' motions to vacate. On June 11, 2007, this Court scheduled a hearing on the matter for June 20, 2007 (DE #26). Plaintiffs' motion to continue was granted to accommodate counsel's pre-paid vacation, and the hearing was rescheduled for June 27, 2007 (DE #30). On June 25, 2007, this Court allowed ABC to intervene in this matter and ordered it to appear at the June 27 hearing (DE #38). ABC then requested to reschedule the hearing, which this Court granted, moving it to July 17, 2007 (DE #39). On June 29, 2007, this Court granted Plaintiffs' Motion to Expedite Discovery, ordering ABC to respond to Plaintiffs' discovery requests before the July 17 hearing (DE #43). On July 16, 2007, this Court denied Plaintiffs' request to continue the July 17 hearing (DE #54).

At the July 17 hearing, Plaintiffs submitted affidavits from Stephen Oliver (DE #60), an employee of CMI, purporting to show that FoShan could not have built the yacht in question. On July 23, 2007, the Court granted the preliminary injunction requiring Plaintiffs to post an injunction bond in the amount of $150,000 (DE #67). Plaintiffs then, on August 3, 2007, filed an Amended Complaint naming BoA, ABC, and FoShan as defendants (DE #73). The Amended Complaint alleged that BoA made certain oral misstatements and omissions in connection with the irrevocable standby letter of credit that Plaintiffs requested be issued by BoA. Plaintiffs asserted claims against BoA for purported negligent misrepresentation, breach of fiduciary duty,

5

and equitable estoppel predicated on those alleged misstatements and omissions.  On August 7, 2007, ABC filed an Answer to BoA's third party complaint, denying the material allegations (DE #74).

On September 11, 2007, ABC filed a motion to vacate (DE #81), simply relying on legal argument of interpretation of banking regulations, leaving the record factually uncontradicted that the contract to build the yacht was a massive fraud to cheat Plaintiffs of their $6 million purchase price.  Having no evidence to contradict Plaintiffs' assertions, the Court left the preliminary injunction in full force and effect on September 27, 2007 (DE #85).

The charges against FoShan alleged by the Plaintiffs in its Amended Verified Complaint (DE #73), as well as the various assertions of wrongdoing reflected in the Counterclaims by Defendants BoA and ABC were dismissed on November 5, 2008 (DE #240) for the failure of any of the parties to obtain service of process on FoShan.

On November 30, 2007, BoA filed an Answer to the Amended Complaint denying the alleged claims and asserting a Counterclaim against the Jaffes and a Cross-claim against ABC (DE #103).  On the same date (November 30), ABC filed an Answer to Plaintiffs' Amended Complaint, contesting the Jaffes' claim of fraud, denying any wrongdoing, and denying that the Jaffes had a right to interfere with the payment of the letter of credit.

## II.    THE TRIAL

The parties were given a full and complete opportunity to conduct all discovery their attorneys deemed relevant to the issues raised in their respective pleadings.  After completion of all discovery, the several evidentiary hearings on preliminary and temporary injunctive relief, a series of hearings on oral argument on various motions testing the adequacy and sufficiency of

the pleadings, charges and countercharges, and at least one full and complete pretrial conference, the matter proceeded to bench trial before the Court on June 29, 2009 through July 2, 2009.

## A.    Plaintiffs' Changed Position at Trial

During the interval of time between the entry of the temporary injunction on May 4, 2007 (DE #13) and the date of the commencement of the trial, the Plaintiffs had modified or abandoned their original theory as evidenced by their presentation to the Court during the several preliminary and temporary injunctive hearings of April and May 2007 based upon alleged wrongdoing of a conspiracy between ABC and FoShan to defraud Mr. and Mrs. Jaffe of the $6,030,500.00 guaranteed purchase price of a luxury yacht which FoShan had contracted to build and the Plaintiffs had promised to buy, to one of almost total reliance upon an alleged oral conversation with Mr. Christopher Ross wherein Mr. Ross, on behalf of BoA, had allegedly promised to include in the integrated written documents assurances to Mr. Jaffe that if the yacht was never built and delivered to Plaintiffs, he would never have to pay the letter of credit he was requesting and was in fact issued by BoA.

The Court notes that Plaintiffs' allegation that BoA and ABC engaged in a civil conspiracy to defraud Plaintiffs is subject to dismissal for abandonment "for failure to present any argument in support thereof." *Ferrell v. Durbin*, 311 Fed. Appx. 253, 258 (11th Cir. 2009). That is, when a party asserts a legal theory but "fail[s] to allege with particularity any factual basis upon which" the theory is based, the claim is subject to dismissal. *Id.* at 259 n.9. However, rather than dismiss the claim on that ground, the Court will analyze the claim on the merits, see *infra* Part IV.F.

7

## B.   Summary of Testimony of Witnesses at Trial

At trial, Plaintiffs called five live witnesses and two by deposition. Neither BoA nor ABC called any witnesses. The testimony of each of Plaintiffs' witnesses is summarized below. Formal findings of fact will be set forth following the summaries.

### 1.   John Jaffe

On direct examination, Mr. Jaffe summarized his business background, as the owner of automotive dealerships (June 29 Tr. 34:14 – 35:8). He has dealt with BoA for over 20 years. His primary dealings were with David Tranary and Glen Hughes at the Automotive Groups (June 29 Tr. 36:16-25). In April of 2004, he contacted Hughes about building a yacht, and told him that he would need a letter of credit. Hughes referred Plaintiff to Chris Ross, an employee of BoA (June 29 Tr. 37:13-25).

Jaffe contacted Ross, told him briefly why he was contacting him, and said "Where do we go from here?" (June 29 Tr. 38:15). Jaffe never met Ross face to face; everything was done by phone or fax (June 29 Tr. 38:18-22). Jaffe informed Ross of the specifics of Jaffe's existing sales contract to buy the yacht, and why he needed the letter of credit. He faxed Ross a copy of the sales contract (June 29 Tr. 40:14-18). Plaintiffs' Exhibit 7, a fax of the sales contract that Jaffe sent to Ross, had no schedules attached (June 29 Tr. 45:1-4). He testified that he told Ross that he had hired Kurt Bosshardt, an attorney, to look over the sales contract for the yacht (June 29 Tr. 42:8-13). Ross told him that Ross was engaging the help of BoA's in house counsel to review the letter of credit documents (June 29 Tr. 43:1-3).

Jaffe testified: "And I wanted assurances that if the boat didn't get built, no letter of credit would ever be cashed." (June 29 Tr. 43:3-5). Jaffe said that no else one was present to hear his phone conversations with Ross (June 29 Tr. 46:22-47:2) when he told Ross: "I told

Chris on numerous occasions in early April, as we were trying to each give each other information, that I wanted to make sure that if the boat didn't get built, I would not have an obligation under the terms of the letter of credit." (June 29 Tr. 47:9-13). Concerned that the deal was not going through fast enough, Jaffe contacted Ross and Hughes, who assured him that everything was fine (June 29 Tr. 48:11-49:5).

Jaffe saw a draft of the letter of credit from Bruce Bales, a yacht broker working for Coke Newton Partners, who represented CMI and FoShan in the sales contract to purchase the yacht (June 29 Tr. 57:5-10). He spoke to Ross about the seller's performance bond he was originally going to get from Ying Teng Credit Guarantee, Ltd., but then the seller proposed a different finance company, and Ross said he would look into that (June 29 Tr. 73:7-15). Ross later told Jaffe that he would not recommend Ying Teng (June 29 Tr. 76:24-77:2).

Jaffe and his wife signed the sales contract for the construction and purchase of the yacht in Peter Tsou's (the representative from CMI, the seller) office in Annapolis, Maryland. Tsou signed for CMI (June 29 Tr. 77:23-78:8). Jaffe then sent the contract to Ross (June 29 Tr. 80:20-21). Plaintiffs' attorney Bosshardt was not there (June 29 Tr. 87:23-88:1).

At the end of May 2004, after Jaffe received the final proposed letter of credit, Jaffe testified he had a conversation with Ross: "And I asked him point blank, does this letter language mean, no boat, no money? And he told me, absolutely." (June 29 Tr. 107:14-108:1). He also testified: "I did ask him on the first amendment, does it change the position, no boat, no money? And he told me, absolutely not. You are protected." (June 29 Tr. 108:6-8). Jaffe also testified that he hired Bosshardt to scrutinize the language of the sales contract, but not the letter of credit. (June 29 Tr. 108:14-19).

Further, Jaffe testified that in the Fall of 2005, he called Ross and told Ross that Tsou was trying to get the letter of credit rescinded, and Plaintiffs wanted, on BoA letterhead, the cost that Jaffe had incurred to date because Tsou was going to get Jaffe's money back (June 29 Tr. 110:12-18). However, Jaffe later learned that BoA was going to have to pay the letter of credit no matter what, and he advised Ross of that fact at some time in 2007 (June 29 Tr. 111:4-9). He also communicated with John Stroud, Ross's replacement at BoA, who was trying to help him get the letter of credit rescinded (June 29 Tr. 116:19-117:19), but he was eventually told that ABC, the beneficiary of the letter of credit, was not going to give the letter of credit back (June 29 Tr. 119:14-25). In January or February of 2007, Jaffe spoke to Mike Evans at BoA's letter of credit department, who told him that BoA could not get the letter of credit back and that if ABC asked for it, BoA was going to pay it. Evans said that it wasn't BoA's job to know if the boat was built or not (June 29 Tr. 120:9-25). He also testified that he told Evans that he was assured by Ross on several occasions that the letter of credit would not be paid if no boat was constructed (June 29 Tr. 123:15-17). Finally, he testified about the amount of damages he had incurred up until that date (June 29 Tr. 127).

On cross examination, Mr. Jaffe noted that he had done more than $1 billion in loans during his career (June 29 Tr. 128:9-13), that he understood that banks sometimes require collateral for loans (June 29 Tr. 129:20-22), and that he was aware that the letter of credit was being used as collateral for the loans the bank was making to the shipyard to build the boat (June 29 Tr. 139:1-8). He admitted that he wanted to buy the boat from a Chinese company for a low price and then planned to flip it and make approximately a $3 million profit (June 29 Tr. 131:1-25). He also said he didn't understand what it meant that ABC was the beneficiary of the letter of credit, and he never asked anyone what it meant (June 29 Tr. 137:1-19).

Regarding the performance bond, Jaffe testified that he asked BoA to investigate Ying
Teng Credit, the company that was originally supposed to provide the performance bond from
FoShan.   Plaintiff gave a different answer on this point in his own deposition, read by the
attorney at trial:

"Q: Question, did you ask Bank of America to do any investigation on our
behalf as to a company called [Ying Teng] Credit Guarantee Co-Limited?
Answer, no.  Now was that true when you gave it?

A: I must have been mistaken, because I did." (June 29 Tr. 153:21-155:1).

With regard to the sales contract and the letter of credit, Mr. Jaffe stated: "My attorney
never represented me on the letter of credit." (June 29 Tr. 155:22).  However, Jaffe equivocated
when asked if the letter of credit language was attached to the sales contract when he signed it:

"Q: And schedule 6 is the language to be used for the letter of credit,
correct?

A: I—I don't know that that makes it ironclad that this is the language.  I
don't know.  I don't know." (June 29 Tr. 158:1-4).

Mr. Jaffe also testified that the letter of credit was originally for the benefit of FoShan,
but then it was amended, with Jaffe's approval, to ABC (June 29 Tr. 159:1-15).   He further
stated that he was the beneficiary of a seller's letter of credit for $300,000 to protect himself,
which he cashed (when FoShan did not build the boat) (June 29 Tr. 170).   He also noted that he
found out that the Allianz performance bond was fraudulent and worthless in October or
November of 2006 (June 29 Tr. 172) and that he had no notes or any documentary evidence of
his conversations with Hughes (June 29 Tr. 175). He also stated that he generally represented
himself in business transactions and was familiar with mortgage lending (June 29 Tr. 177:1-23);
that for one transaction in which he was involved in 1999 a letter of credit was listed as a debt

11

(June 29 Tr. 180:1-18); and that he mortgaged some of his property to guarantee the letter of credit to BoA (June 29 Tr. 182:4-185:7).

Regarding the involvement of his attorney Bosshardt, he stated: "I retained him to review the documents that I handed to him, which didn't have the amendments. Sat across him, here's the sales contract. Want you to review it. Want to know if I'm protected." (June 29 Tr. 195:8-11). On cross-examination, he was read his deposition in which he said Bosshardt was to review the contract in its entirety, and he said he sent the entire thing to him (June 29 Tr. 196:1-14). He later said that he told Bosshardt, not at their first meeting, but when he had the whole sales contract, that Bosshardt was not supposed to deal with the letter of credit (June 30 Tr. 2:2-8). He testified that he talked to Bosshardt on April 20 about "a" letter of credit, which Jaffe stated was the seller's letter of credit for his benefit, then on April 21, he forwarded Bosshardt a revision of the BoA letter of credit (June 30 Tr. 7). He admitted that he did not have any documentation supporting the idea that the seller's letter of credit for his benefit was circulated earlier than May 3 (June 30 Tr. 10:19-23). Regarding whether he wanted Bosshardt to represent him for the letter of credit language, he was impeached with his deposition, which indicated that Bosshardt had in fact reassured him about the letter of credit language, although Jaffe claims he was referring only to the original sales contract:

> "Q: You actually heard that [no boat, no money] from your lawyer, didn't you?
>
> A: No.
>
> Q: Okay, sir. Pull your deposition out, please. [. . .] [reading from the deposition] Question, other than Bank of America representations to you to, did you rely on anything else for that comfort? Answer, that it could not be cashed without the boat being built? Question, right. [. . .] Question, did you hear that also from your attorney? Answer, I think so, I think I did.

> A: Yes, I did. But that has to do with the sales contract." (June 30
> Tr. 13:9-14:22).

Jaffe further admitted that he had no notes or evidence of his conversations with Ross (June 29 Tr. 202:13-25). Significantly, he also admitted that he approved the letter of credit language which did not include a stipulation that the money would only be paid upon completion of the yacht:

> "Q: Okay, so this is evidence that you actually approved the
> language in the [letter] of the credit itself, right?
>
> A: I approved this one." (June 29 Tr. 213:1-3).

He also admitted that he understood that the letter of credit was irrevocable (June 29 Tr. 214:13-20).

Jaffe also contradicted himself when he testified in court that only Ross and Tsou told him about the "no boat, no money" stipulation: In his deposition, which was read into the record in court, he stated that Bruce Bales and Rob Newton also told him that (June 29 Tr. 217:1-218:3). He acknowledged that a letter sent to BoA telling BoA not to pay the letter of credit did not accuse BoA of fraud or misrepresentation (June 30 Tr. 21:6-17). He also acknowledged that he knew since May of 2006 at least, when no boat had been built for two years since the contract was signed, that the boat was not going to be built and Tsou was being disingenuous (June 30 Tr. 28:1-29:22). Finally, Jaffe acknowledged that he had no evidence that he informed Ross that the performance bond was fraudulent (June 30 Tr. 61:20-24), and when asked if he forwarded letters to Ross that he received saying the performance bond was fraudulent, he responded that he couldn't recall (June 30 Tr. 62:20-25).

## 2.    Kurt Bosshardt

Plaintiffs called Mr. Kurt Bosshardt to testify as to the allegations that Mr. Jaffe did not have the advice of legal counsel as to the wording of the buyer's letter of credit. Mr. Bosshardt has practiced law for twenty-three years specializing in yacht sales and transactions. He was retained by Mr. Jaffe on April 19, 2004 to "look at the draft building contract that had been presented, and give [Mr. Jaffe] my thoughts." (June 30 Tr. 64:11; 65:9-14).

Mr. Bosshardt testified on direct that, from the beginning of his involvement with the Plaintiffs, Mr. Jaffe "put[] me on a pretty short leash, meaning he did not want me to get involved in the entire transaction." (June 30 Tr. 66:3-5). Specifically, Mr. Bosshardt said his "involvement was limited to "review[ing] the vessel purchase agreement." (June 30 Tr. 66:12-13). On direct examination, Mr. Bosshardt testified that "I reviewed the contract. I never received schedules to the contract . . . I did receive at some point, the, a letter of credit that was to be posted by the seller, as well as a performance bond." (Jun. 30 Tr. 73:9-11, 19-22).

While Mr. Bosshardt first testified that he "was kept on a short leash" and only was directed to review the sales agreement, he later admitted that there was no language in his retainer agreement with Mr. Jaffe that limited the scope of his representation and precluded him from reviewing aspects of financing. (Jun. 30 Tr. 86:4-9).

According to Mr. Bosshardt's notes from his conversations with Mr. Jaffe on April 20, 2004, he had at least three telephone calls or conversations with Mr. Jaffe about "letters of credit." (Pl. Ex. 9). While Mr. Bosshardt initially testified on direct examination that during his representation of Mr. Jaffe he only reviewed the *seller's* letter of credit, he reversed this testimony on cross-examination. Mr. Bosshardt testified that, at the time of his notations on April 20, 2004 regarding discussions of a letter of credit, he had been reviewing the draft

purchase agreement between CMI and Mr. Jaffe (Pl. Ex. 7; Jun. 30 Tr. 92:6-9). A review of the draft agreement demonstrates that, at this point in the negotiations of the agreement, there was no mention of a *seller's* letter of credit. After being confronted with this, Mr. Bosshardt then testified that, in reality, in his notes about his conversations with Mr. Jaffe he was "probably referring to the *buyer's* letter of credit." (Jun. 30 Tr. 94:18-23) (emphasis added).

Not only did Mr. Bosshardt know that the buyer's letter of credit was included in the purchase agreement, he had concerns about this particular finance instrument and expressed such concerns to Mr. Jaffe. Mr. Bosshardt testified as to the conversations that he had with Mr. Jaffe about letters of credit that:

"I remember three categories of the conversation. One, I think I had identified it as an irrevocable stand-by letter of credit, because that's in my notes. And my limited understanding of letters of credit would be that that was an instrument that was payable. Not based on performance or terms or documents. . . . That the second gist of the conversation would have been I don't have experience in this field, that I had an attorney I would refer it to, who had experience in finance instruments . . . And thirdly, . . . that I've never seen this in a yacht construction agreement before."

(Jun. 30 Tr. 98:5-17). Mr. Bosshardt described Mr. Jaffe's response to the concerns about the letter of credit: "[I]t was right from the beginning that he told me not to worry, that I didn't need to be concerned with that side of the equation, or his, how he was going to pay for the yacht . . . ." (Jun. 30 Tr. 98:22-25).

Finally, Mr. Bosshardt testified that he also had significant concerns over a clause in the contract that involved the potential subcontracting by the builder of certain work on the yacht. Mr. Bosshardt testified that paragraph 2.2 of the original purchase agreement (Pl. Ex. 7) permitted the builder to subcontract all or part of the design and construction of the boat (Jun. 30 Tr. 160:5-7). Mr. Bosshardt testified that he was concerned about this clause because "in past transactions, [I] would want to put a control on that, that a shipyard could not simply buy a

contract and then subcontract with another, another yard that we weren't familiar with to complete the boat." (Jun. 30 Tr. 159:19-22). Mr. Bosshardt noted his concerns about this clause on his review of the original agreement.

### 3.    Christopher Ross

The heart of Mr. Jaffe's legal argument in this case rests upon his conversations with Mr. Christopher Ross, a former employee of the private banking division of BoA.  Mr. Jaffe swore that Mr. Ross gave him assurances that the standby letter of credit in dispute in this case would only be drawn down in the event that Mr. Jaffe's yacht was constructed and delivered to him in Miami, Florida. It is uncontradicted that these conversations occurred over the phone, that the two (Jaffe and Ross) never met and that there are no other witnesses (or notes) to confirm Jaffe's statement of "no boat, no money."    However, Mr. Ross's testimony denied any such conversation ever took place and affirmed that he wrote the letter of credit in exactly the language Jaffe wanted.

Upon first being asked by Plaintiffs' counsel at trial if he ever discussed with Mr. Jaffe whether "the bank would undertake to protect Mr. Jaffe's interests," Mr. Ross replied, "Not at all."  Thereafter, Mr. Ross was asked, "Do you recall talking, discussing personal guarantees in that initial conversation?" He replied, "No." (June 30 Tr. 190:1-3). Plaintiffs' counsel continued, "What was discussed, if anything, regarding shopping for sureties, if you can recall?" Mr. Ross replied, "Nothing from my end. I don't recall anything." (June 30 Tr. 191:19-21).

Mr. Ross stated at trial that "[Mr. Jaffe] brought the complete verbiage of the letter of credit to us," and that "the document that he brought was what he wanted. Verbally, there was nothing else discuss[ed]."  When asked again whether Mr. Jaffe ever verbally requested that, should the boat not be delivered, then the letter of credit would not need to be paid, Mr. Ross

16

stated, "I would remember that, and no, he did not." (June 30 Tr. 201:21 - 203:20). Later in questioning, Mr. Ross was once again asked, "did you have a conversation with Mr. Jaffe to the effect that the letter of credit cannot be drawn down on unless the yacht was completed and delivered to the specifications in the construction contract." Mr. Ross replied, "I wouldn't have made that statement to him." (June 30 Tr. 215:13 - 215:17). Thereafter, following Mr. Ross's testimony in which he described Mr. Jaffe as "directive" in his dealings with Mr. Ross, the Court asked Mr. Ross, "Did Mr. Jaffe tell you, as best you recall, to put something in the letter of credit, to write it in or have it written in that you, on behalf, that you did not add in or refused to add in? Did that come up?" Mr. Ross replied, "No, it did not." Upon being asked "Was everything that Mr. Jaffe asked you to put in the letter of credit in June of 2004, included in the ultimate final letter of credit that was issued on June 9, 2004?," Mr. Ross responded, "Yes, it was." (July 1 Tr. 11:14-22). On cross-examination, Mr. Ross was asked one last time, "you told us yesterday on your direct examination that the language which was in the letter of credit was supplied by Mr. Jaffe, correct?" Mr. Ross answered, "Correct." (July 1 Tr. 44:11-14). In short, Mr. Ross made it clear that he included in the letter of credit only what he and Mr. Jaffe had discussed, and that those discussions included nothing to the effect of "no boat, no money."

Plaintiffs' counsel attempted to impeach Mr. Ross on several occasions, but was unsuccessful in each instance. Counsel refreshed Mr. Ross's recollection with his prior deposition testimony (June 30 Tr. 204:12-205:5), where he answered in the affirmative to the question, "Okay, did you understand that Mr. Jaffe wanted the letter of credit to be drawn down only after his yacht was delivered as per his yacht construction contract?" (Depo. of Christopher King Ross, D.E. #175-4, p. 152). However, he later clarified that he was referring to his

understanding of Mr. Jaffe's desires as to his *sales contract*. Neither Mr. Ross nor BoA were involved in this contract (July 1 Tr. 12:15-16:20).

Mr. Ross informed the Court that he was aware that Mr. Jaffe has accused him of "misrepresent[ing] myself and my role at Bank of America," yet stated in a calm and collected demeanor that he harbored no feelings of bias or animosity toward Mr. Jaffe (June 30 Tr. 175:6 - 175:16). He is no longer a BoA employee, having left BoA during the middle of 2005 (June 30 Tr. 172:15).

Regarding Mr. Jaffe's contention that he did not employ or solicit legal counsel's advice regarding the letter of credit, Mr. Ross stated that "I referred him to his counsel several times . . . throughout the transaction." (June 30 Tr. 185:20 - 186:12).

### 4.    Mr. Jianwei Zhou

The Plaintiffs called Mr. Jianwei Zhou, an ABC employee, to testify that ABC committed a fraud and was engaged in a civil conspiracy with FoShan.

As an initial matter, Mr. Zhou testified that, in his capacity as the director of the Shunde Qinz Fei branch of ABC, he did not deal with letters of credit (July 1 Tr. 74:19-21). Furthermore, he testified that no one at his branch of ABC dealt with letters of credit (July 1 Tr. 75: 3-5).

Mr. Zhou stated that he was involved with ABC's loan to FoShan. This loan was secured by the letter of credit from BoA. (July 1, 2009 Tr. 84:6-7, 21-22). Mr. Zhou explained that Zhou Zhang Xian, a representative of FoShan, visited ABC in September 2003. Mr. Xian told Mr. Zhou that FoShan was "a ship manufacturing factory . . . And they have some international business." (July 1 Tr. 110: 19-20).

In discussing ABC's loan to FoShan, Mr. Zhou explained that this was the *only loan* that he was aware of that had been made by ABC to FoShan (July 1 Tr. 107: 25). Mr. Zhou testified that, before ABC made the loan to FoShan, ABC "knew that [FoShan] had the capability to make a yacht." (July 1 Tr. 121:1-2). In 2004, after ABC had made the loan to Foshan, Mr. Zhou testified that it was not the responsibility of ABC to know whether FoShan could make the specific yacht identified in the Jaffe contract (July 1 Tr. 121:16-18). Mr. Zhou visited each of FoShan's two locations—Gong Dong and Swin Del—a number of times between 2004 and 2007 (July 1 Tr. 125: 5-16). Mr. Zhou testified that he visited "[i]n 2004, [each shipyard] once. In 2005, once to Swin Del, once to Gong Dong. . . . In 2006, I went to the shipyard in Swin Del once, and to the shipyard in Gong Dong once. . . . [in 2007] [t]wice to Swin Del." (July 1 Tr. 125: 5-16). He insisted as a matter of interest to see the shipyard, not having any duty to check on Plaintiffs' boat.

Finally, in July 2006, when FoShan told Mr. Zhou that they were indeed not building Mr. Jaffe's 125-foot yacht, Mr. Zhou testified that he immediately asked FoShan to return the entire loan amount back to the bank (July 1 Tr. 122:1-6).

### 5.    Mr. Lu Jin Chao

The Plaintiffs next called Mr. Lu Jin Chao, another ABC employee, to support Plaintiffs' theory that ABC committed fraud and civil conspiracy with FoShan. Similar to Mr. Zhou, Mr. Chao also stated that he was "not in charge of letters of credit" (July 1 Tr. 133:25), and never spoke to anyone at FoShan about the specific letter of credit at issue (July 1 Tr. 134:10-14).

Mr. Chao did acknowledge having discussed international business in general with representatives from FoShan. Specifically, Mr. Chao was told by FoShan representatives that they had boats that they wanted to export overseas and wanted ABC to help finalize the business

transactions (July 1 Tr. 136: 17-19). As to the letter of credit issued by BoA, Mr. Chao testified that he had never seen the letter of credit (July 1 Tr. 140: 16-18).

Mr. Chao testified that, in his capacity as an ABC employee, he had heard in July 2006 that the Jaffes' boat was not being built (July 1 Tr. 140: 19-22). After hearing of this, ABC asked FoShan to return the loan amount (July 1 Tr. 140: 24-25). According to Mr. Chao's testimony, to this day, while FoShan has returned a portion of the loan amount, Foshan still owes ABC a substantial portion of the loan (July 1 Tr. 144: 21-23).

### 6.    The Deposition of Margaret Haider

Portions of Ms. Haider's deposition were introduced into evidence. Ms. Haider, a BoA employee who works with letters of credit, testified generally about the letter of credit process, but she had no involvement with the Jaffes' case or with Mr. Ross.

### 7.    The Deposition of Tie Anh Liu

The Plaintiffs introduced the January 2, 2008 telephone deposition of Tai Anh Lu, an employee of BoA who works in the standby letter of credit department in the Los Angeles, California office. Plaintiffs asked Ms. Lu about the general procedures for a client to amend a letter of credit with BoA. After discussing the procedures, Plaintiffs asked Ms. Lu about her involvement with the Jaffes' letter of credit. Ms. Lu could not recall speaking with nor ever communicating with Mr. Jaffe (Jan. 2, 2008 Dep. 9:8-12). Ms. Lu stated that she was not involved in any way with the June 2004 drafting of the letter of credit (Jan. 2, 2008 Dep. 25:7-12). Ms. Lu did not recall any conversations with Chris Ross or any specific action she took in amending the Jaffes' letter of credit.

## III.    THE COURT'S FINDINGS OF FACT

The Court, having carefully reviewed the witnesses' testimony and the trial exhibits, makes the following findings of fact.

### A.    Initial Background

John Jaffe is a sophisticated businessman owning several automotive dealerships. Although he had limited experience with letters of credit, he had extensive experience with commercial loans and mortgage lending. He had been involved in more than $1 billion in loans throughout his career in the automobile business. He knew and understood that the letter of credit in this instance was being used as collateral for the loans that ABC was making to the shipyard to build the yacht.

In his relationship with BoA for over twenty years, he had primarily dealt with BoA employees David Tranary and Glen Hughes in BoA's Automotive Group. After Plaintiff had contracted to purchase a new yacht from FoShan in approximately April of 2004, Jaffe contacted Hughes and told him that he would need an letter of credit to support the sales contract. As part of his sales contract, Jaffe needed a letter of credit from a bank pledging to pay the purchase price of the boat. Hughes gave Jaffe the name of Christopher Ross, another BoA employee who dealt with letters of credit.

### B.    The Involvement of Kurt Bosshardt

On April 19, 2004, Jaffe retained the services of Kurt Bosshardt, an attorney practicing for twenty-three years and specializing in yacht sales and transactions, to review the proposed yacht sales agreement.    There is a dispute in the testimony regarding the scope of the representation. Jaffe claims that he instructed Bosshardt to only review the sales contract, and not the letter of credit that was associated with it. However, his deposition testimony, in which

he stated that he retained Bosshardt to review the *entire* contract, contradicted this. In fact, Mr. Jaffe admitted that he spoke to Bosshardt about a letter of credit, but claims that it was the seller's letter of credit that ABC was issuing for his benefit, not the BoA letter of credit that he was referring to in deposition. Mr. Jaffe's claim, however, is contradicted by Mr. Bosshardt's eventual admission, discussed below, that he actually discussed the BoA letter of credit with Mr. Jaffe.

Moreover, although Bosshardt initially testified that he was not supposed to review the financing for the transaction, he admitted that there was no language in the retainer agreement to support that limitation. In fact, according to Mr. Bosshardt's notes from his conversations with Mr. Jaffe on April 20, 2004, he had at least three telephone calls or conversations with Mr. Jaffe about "letters of credit." While Mr. Bosshardt initially testified on direct examination that during his representation of Mr. Jaffe he only reviewed the *seller's* letter of credit, his testimony on cross-examination shows that was not the case. Mr. Bosshardt testified that, at the time of his notations on April 20, 2004 regarding discussions of a letter of credit, he had been reviewing the draft purchase agreement between CMI and Mr. Jaffe (Pl. Ex. 7). A review of the draft agreement demonstrates that, at this point in the negotiations of the agreement, there was no mention of a seller's letter of credit. After being confronted with this, Mr. Bosshardt then testified that, in reality, in his notes about his conversations with Mr. Jaffe he was "probably referring to the *buyer's* letter of credit." (June 30 Tr. 94:18-23) (emphasis added).

Thus, the Court finds that Mr. Jaffe actually did ask Mr. Bosshardt to review BoA's letter of credit, and that Bosshardt had significant concerns about the buyer's letter of credit included in the draft of the purchase agreement. The Court further finds that he clearly expressed these concerns to Mr. Jaffe, to which Mr. Jaffe deliberately refused any further assistance or advice

from Mr. Bosshardt, and declined any offer by Mr. Bosshardt to put him in touch with an expert on such banking instruments.

### C.      Jaffe's Conversations with Chris Ross

Jaffe's conversations with Chris Ross are essentially at the heart of this case. In brief, Jaffe claims that he told Ross the language he wanted, and Ross assured him, that the letter of credit would include a stipulation that it would be paid only upon completion of the yacht (i.e., "no boat, no money"). Ross claims that Jaffe made no such request and Ross made no such assurances. As discussed more fully below, the Court finds Mr. Ross's testimony on this point to be truthful, accurate and credible. Mr. Jaffe's testimony is not.

In 2004, Jaffe contacted Ross for the purpose of getting the letter of credit that was required by his sales contract for the purchase of the yacht. Jaffe never met Ross face to face, but via phone and fax he informed Ross of the specifics of the Jaffes' existing contract to purchase the yacht, and he faxed Ross a copy of the sales contract. Jaffe intended to purchase the boat at the low price of approximately $6 million, and then sell his contract, expecting to make roughly a $3 million profit. The BoA letter of credit was secured by several mortgages and other securities on Mr. Jaffe's property. On May 31, 2004, Jaffe and his wife signed the sales contract for the purchase of the boat in Annapolis, Maryland. Peter Tsou, as representative of CMI, the seller/contractor, was also present and signed for CMI. The agreement required Plaintiff to furnish a letter of credit, which he then sought from BoA through Mr. Ross.

Although Jaffe testified that he told Ross on numerous occasions that he wanted the "no boat, no money" stipulation included in the letter of credit, the Court cannot credit that testimony. Jaffe could produce no evidence, documentary or otherwise, that he made these statements to Ross. Jaffe equivocated several times on the witness stand, stating at first that he

did not tell Ross what he wanted in the contract, then saying that he did. His testimony also contained contradictions on who allegedly told him about the "no boat, no money" stipulation. Most importantly, his testimony is belied by the fact that the entire letter of credit agreement was reduced to writing with language that Jaffe himself provided to Ross, and he himself read, approved, and signed. He also admitted that he knew and understood that that letter of credit was irrevocable. Thus, the Court simply cannot credit his testimony on this point.

Conversely, Ross testified, in a forthright and direct manner that the Court finds to be wholly credible, that Jaffe never told him he wanted the "no boat, no money" stipulation, and that Ross never promised Jaffe that such a stipulation would be included in the letter of credit. Ross's testimony was consistent and unimpeached on this point. Ross no longer works for BoA, has no reason to lie, and harbors no animosity toward Mr. Jaffe. Thus, the evidentiary conflict boils down to Mr. Jaffe's word on one side versus Mr. Ross's word on the other, supported by the final letter of credit (which did not contain a "no boat, no money" stipulation) that Jaffe approved and signed. Given the credibility issues, the Court finds that Plaintiffs have not proven by a preponderance of evidence Mr. Jaffe's version of events. Thus, the Court finds that Mr. Jaffe did not tell Mr. Ross to include the "no boat, no money" stipulation, and Mr. Ross did not assure Mr. Jaffe that such language would be included in the letter of credit. All Mr. Jaffe needed to do, when presented with the BoA letter of credit and seeing that it did not have the "no boat, no money" phrase in it, was to refuse to agree and sign. Furthermore, the Court finds that Mr. Ross was acting in good faith, that BoA charged Mr. Jaffe fair fees for its services, and that Mr. Jaffe received a favorable special customer rate.

**D.    The Performance Bond and Final Outcome of the Transaction**

As it turned out, the transaction did not proceed as Mr. Jaffe planned.  In fact, the yacht was never built.  However, these two Defendants (BoA and ABC) had nothing to do with Plaintiffs' contract with FoShan to build the boat and were not responsible for FoShan's failure to build the yacht.

To protect himself in the transaction, Mr. Jaffe took two principal steps.  First, he insisted on a seller's letter of credit from ABC for his benefit in the amount of $300,000, to be paid in the event the boat was not built.  When ABC learned of FoShan's breach, ABC paid Plaintiff the $300,000 on this (separate) letter of credit.  He received the money as his damages for FoShan's failure to comply and build the boat.  Second, he attempted to secure a performance bond guaranteeing payment to him in the event that the yacht was not built by FoShan.  He originally sought out a company called Ying Teng Credit Guarantee, Ltd., but that was later changed to a company called Allianz.  However, by October of 2004, Mr. Jaffe was contacted by the FBI, when agents informed him that the performance bond was fraudulent, and Allianz was under investigation for issuing phony performance bonds.  Jaffe did not timely notify anyone at BoA that this bond (protecting him, and which he had obtained and paid for) was phony and worthless.

In approximately October of 2004, the Jaffes learned that the yacht was not being built.  They did not go to China or do much to rectify the situation, except to eventually contact Peter Tsou, who advised Jaffe that he would try to get the letter of credit rescinded.  At some point thereafter, the Jaffes notified BoA that there was a problem and that they sought to cancel the letter of credit.  However, BoA, through John Stroud and Mike Evans, notified the Jaffes that if ABC requested a draw on the letter of credit, it would be paid.

25

### E.    Defendant Agricultural Bank of China's Involvement

Mr. Jaffe's letter of credit named ABC as the beneficiary and provided that BoA would pay ABC from the letter of credit upon the presentation of a certified statement of ABC's loan of funds to FoShan. ABC made a loan to FoShan to finance the construction of the yacht, which was secured by Mr. Jaffe's letter of credit. This was the only loan that ABC had made to FoShan. No employee or representative at ABC had a prior business relationship with anyone at FoShan. In making the loan to FoShan, ABC employees considered the shipyard's capabilities of building such a yacht and visited the two separate boatyard facilities operated by FoShan where yacht-building activity was observed ongoing.

In July 2006, ABC learned for the first time that FoShan had not used the loan to complete the construction of the yacht. ABC had no responsibility to visit FoShan and follow up on the construction of the yacht. In fact, due to the yacht sales agreement's subcontracting clause agreed to by Mr. Jaffe, a visit to the shipyard would not provide this information. Upon learning that FoShan had not used the loan proceeds as required, representatives of ABC demanded that FoShan immediately pay back the loan amount. Since ABC made that demand, a substantial amount of the loan, plus interest, is still outstanding.

## IV.    CONCLUSIONS OF LAW

After carefully considering the evidence adduced at trial, the parties' pleadings, and the legal authorities and arguments cited therein, the Court makes the following conclusions of law.

### A.    Letters of Credit Generally

A letter of credit is a unique method of payment through which a bank extends credit on behalf of a buyer in a cash sale. In its simplest terms, a letter of credit is utilized as follows:

> Pursuant to a provision in [an] underlying contract, the customer will enter into a contract with its bank, known as the issuer, requesting it to issue a letter of credit

26

in favor of the beneficiary. The letter of credit represents the relationship between the issuer and beneficiary. It is an engagement or pledge by the issuer that it will honor the beneficiary's drafts or demands of payment upon the beneficiary's compliance with conditions specified in the letter. Under this arrangement, the beneficiary is ensured payment after presenting the necessary documents to the issuer . . . After honoring the letter of credit, the issuer's possession of the controlling documents secures its right to be reimbursed by the customer for payment to the beneficiary under the letter of credit. *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578-79 (11th Cir. 1994) (internal citations omitted).

In fact, "a letter of credit is a separate contract, independent of the underlying obligations or transactions that give rise to its issuance, and that strict adherence to this principle is necessary to protect the integrity of letters of credit as a valuable commercial tool." *In re Prime Motor Inns, Inc.*, 130 B.R. 610, 613 (S.D. Fla. 1991). As a matter of law, the reference to the underlying contract in the letter of credit does not incorporate the terms of the underlying contract into the letter of credit. *See Barklay's Bank v. Dresdner Bank Lateinamerika*, 284 B.R. 152, 160 (S.D. Fla. 2002).

An important aspect of the letter of credit is that it is subject to the independence principle, which provides that, absent any fraud in connection with the letters of credit itself, the issuer's obligation to make payment to the beneficiary is independent of any party's performance on any other underlying contract. *In re Air Conditioning, Inc. of Stuart*, 72 B.R. 657, 660 (S.D. Fla. 1987). "Thus, the letter of credit can be distinguished from a guarantee because the issuer is primarily liable and cannot assert defenses available to the customer that arise from a breach in the underlying contract." *Dibrell Bros. Int'l, S.A.*, 38 F.3d at 1579.

### B.    Count 2: Breach of Fiduciary Duty Against Bank of America

Under Florida law, "[t]he elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). "One in such a

27

fiduciary relationship is subject to legal responsibility for harm flowing from a breach of fiduciary duty imposed by the relationship." *Id.* at 352.

"To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Watkins v. NCNB Nat'l Bank, N.A.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) (quoting *Bankest Imports, Inc. v. Isca Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989)). Generally, "[i]n an arms-length transaction, however, there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own diligence have discovered." *Watkins*, 622 So. 2d at 1065 (quoting *Lanz v. Resolution Trust Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991)). "Under Florida law, it is clear that a lender does not ordinarily owe fiduciary duties to its borrower." *Motorcity of Jacksonville, Ltd. v. Se. Bank N.A.*, 83 F.3d 1317, 1339 (11th Cir. 1996). "One may not . . . unilaterally impose a fiduciary relationship [on a lender] without a conscious assumption of such duties by [the lender] to be held liable as a fiduciary." *Id.* (quoting *Denison State Bank v. Madeira*, 640 P.2d 1235, 1244 (Kan. 1982)). Among other things, there must be "circumstances exceeding an ordinary commercial transaction." *Motorcity of Jacksonville*, 83 F.3d at 1340 (quoting *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 521 (Fla. 3d DCA 1994)). "[I]t is clear that [a lender's] long standing business relationship with [a borrower], without more, cannot transform the lender-borrower relationship into a fiduciary one." *Motorcity of Jacksonville*, 83 F.3d at 1340 n.21.

Here, Plaintiffs have not established that BoA had a fiduciary duty to Mr. Jaffe. The relationship between Mr. Jaffe and BoA was nothing more than lender-borrower, which is nothing more than the product of an arms-length transaction, not a fiduciary relationship. The only fact that Plaintiffs claim establish such a duty is that Mr. Jaffe had a long-standing business

relationship with BoA. That claim is squarely controlled by the *Motorcity of Jacksonville* case, which holds that such a relationship alone does not create a fiduciary duty. Plaintiffs did not request BoA to undertake a duty of trust and dependency, and no one at BoA ever agreed to assume such a duty. Thus, no fiduciary relationship existed between Plaintiffs and BoA, and therefore their claim in Count 2 must fail.

### C. Counts 3 & 4: Equitable Estoppel & Negligent Misrepresentation Against Bank of America

Plaintiffs' theory of law alleged in Counts 3 and 4 involve similar elements, and so will be discussed together. On a claim for negligent misrepresentation, the court must determine the following issues: "First, whether (defendant) made a . . . statement to another concerning a material fact that . . . [it] believed to be true but which was in fact false; Second, whether in the exercise of reasonable care under the circumstances, (defendant) was negligent in making the statement because . . . [it] should have known the statement was false; Third, whether in making the . . . statement, (defendant) intended [or expected] that another would rely on the statement; Fourth, whether (claimant) justifiably relied on the false statement; and Fifth, whether (claimant) suffered [loss] [injury] [or] [damage] as a result." *Std. Jury Instructions-Civil Cases (No. 99-2)*, 777 So. 2d 378, 382 (Fla. 2000). To state a claim for negligent misrepresentation, the plaintiff must demonstrate that the defendant made a statement of fact which was untrue. *See Souran v. Traveler's Ins. Co.*, 982 F.2d 1497, 1503 (11th Cir. 1993). "The elements of [sic] negligent misrepresentation action are identical to those for common law fraud, except that in the former, actual knowledge is not required in order to establish scienter." *Bailey v. Janssen Pharmaceutica, Inc.*, Case No. 06-80702, 2006 WL 3665417, at *7 (S.D. Fla. Nov. 14, 2006) (quoting *Tapken v. Brown*, Case No. 90-691, 1992 WL 178984, at *24 (S.D. Fla. Mar. 13, 1992)).

"The elements of equitable estoppel are (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon." *State v. Harris*, 881 So. 2d 1079, 1084 (Fla. 2004). "[A] party may successfully maintain a suit under the theory of equitable estoppel only where there is proof of fraud, misrepresentation, or other affirmative deception." *Rinker Materials Corp. v. Palmer First Nat'l Bank & Trust Co. of Sarasota*, 361 So. 2d 156, 159 (Fla. 1978).

"Reliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement." *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007) (quoting *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 1999)). "In Florida, 'evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract.'" *Johnson Enters. of Jacksonville v. FPL Group*, 162 F.3d 1290, 1309 (11th Cir. 1998) (quoting *Chase Manhattan Bank v. Rood*, 698 F.2d 435, 436 (11th Cir. 1983)). Indeed, "every person must use reasonable diligence for his own protection. Under any standard of conduct, and in the absence of accompanying actual deception, artifice, or misconduct, it is well agreed that where the means of knowledge are at hand and are equally available to both parties, and the subject matter is equally open to their inspection, if one of them does not avail himself of those means and opportunities, he will not be heard to say that he was deceived by the other's misrepresentations." *Potakar v. Hurtak*, 82 So. 2d 502, 504 (Fla. 1955).

To prevail on a claim of negligent misrepresentation or equitable estoppel, the plaintiff bears the burden of proving that the defendant's conduct proximately caused their alleged

damages. *See Harris*, 881 So. 2d at 1084 (equitable estoppel); *Stahl v. Metro. Dade County*, 438 So. 2d 14, 17 (Fla. 3d DCA 1983) (negligence).   Proximate cause is defined in terms of foreseeability.  Thus, "when the loss is not a direct result of the negligent act complained of, or does not follow in natural ordinary sequence from such act but is merely a possible, as distinguished from a natural and probable, result of the negligence, recovery will not be allowed." *Cone v. Inter County Tel. & Tel. Co.*, 40 So. 2d 148, 149 (Fla. 1949).  Accordingly, "[w]here the injury is caused by the intervention of an independent efficient cause to which the defendant did not contribute and he is not responsible, or is caused by the act or omission of the plaintiff, the negligence of the defendant is not the proximate cause of the injury. If the plaintiff contributes proximately to causing the injury, he cannot recover, unless otherwise provided by statute." *Benedict Pineapple Co. v. Atl. Coast Line R.R. Co.*, 46 So. 732, 737 (Fla. 1908).

Plaintiffs' allegation that BoA told Mr. Jaffe that he would be protected in the letter of credit transaction with a stipulation that the letter of credit would only be paid upon completion of the yacht construction (i.e., "no boat, no money") fails for lack of any credible proof. Plaintiffs cannot prevail on either their equitable estoppel or negligent misrepresentation claims because, as discussed in this Court's findings of fact, Mr. Ross did not make any such representation to the Jaffes.  Moreover, even if BoA had made such a representation, the claims would still fail as a matter of law because, as stated in the *Johnson Enterprises* case, reliance upon alleged oral misrepresentations is unreasonable and unjustified where the subsequently executed written document does not contain the alleged representations or promises.  Here, the letter of credit contained the language requested and which was entirely provided by Mr. Jaffe to Mr. Ross.  Mr. Jaffe read, approved, and signed the document   Reliance on alleged oral

representations is unjustified in such an instance. Thus, Plaintiffs' claims under Counts 3 and 4 must fail.

### D.    Count 5: Fraud Against Agricultural Bank of China

The fraud exception to the independence principle, see *supra* Part IV.A, applying to letters of credit, must be construed narrowly and based on legitimate and supported allegations. *See Resolution Trust Corp. v. United Trust Fund*, 57 F.3d 1025, 1034 n.11 (11th Cir. 1995). Plaintiffs bear the burden of proving fraud. *See Employers Reinsurance Corp. v. Neighborhood Health P'ship, Inc.*, Case No. 01-4233, 2003 WL 23833948, at *2 (S.D. Fla. Apr. 17, 2003). "[T]o prove fraud 'only a preponderance or greater weight of the evidence is required.'" *Gen. Trading v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1498 (11th Cir. 1997) (quoting *Rigot v. Bucci*, 245 So. 2d 51, 53 (Fla.1971)). "Under Florida law, the essential elements of a cause of action for fraud are: (1) a false statement of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the correctness of the representation; and (5) resulting damage or injury . . . In addition, plaintiff's reliance on the representation must be reasonable." *Pitts Sales, Inc. v. King World Prods.*, 383 F. Supp. 2d 1354, 1362-63 (S.D. Fla. 2005).

In the instant case, fraud comes under consideration because there is a fraud exception to the independence principle in letters of credit. That is, although a letter of credit is normally independent from the underlying contract, the letter of credit may be rescinded if the underlying contract was procured through fraud. The fraud exception to the independence principle must be construed narrowly and must be based on legitimate and supported allegations. *See Resolution Trust Corp.*, 57 F.3d at 1034 n.11.

Here, Plaintiffs claim that ABC engaged in fraud by (1) making loans to FoShan without securing those loans with collateral, (2) loaning money to FoShan to build the yacht when it knew that FoShan did not have the capability to do so, and (3) lying when it demanded payment on the letter of credit by stating that it was indebted to FoShan for building the yacht. Plaintiffs have not met their burden of proof in this record to establish any of the three allegations. As to the first two claims, the undisputed testimony at trial was that the ABC employees visited the FoShan shipyards and saw that it was indeed capable of building yachts. Moreover, even if it appeared that FoShan was incapable of building the yacht, this would not have raised a red flag because the contract permitted FoShan to subcontract the building of the yacht to another company. The contract of sale between Jaffe and FoShan/CMI gave the subcontracting right to the builders without Plaintiffs' prior permission. Thus, had FoShan subcontracted the building of the Jaffe yacht out to another company, at another shipyard, no one visiting the FoShan shipyard would have seen the Jaffe boat being constructed. Jaffe had the right, under the contract (with FoShan/CMI) to have his own representatives present at all times to observe and supervise the building of his yacht. He never exercised this right. As to the third claim, the law of letters of credit makes clear that the letter of credit is payable upon demand, notwithstanding the performance or nonperformance of the underlying contract. Furthermore, as agreed by all parties in the Joint Pretrial Stipulation (DE #248, p. 23, ¶7), the letter of credit did not impose any duties on ABC to supervise the underlying contract between CMI and Plaintiffs. There is no other evidence in the record which would support a fraud claim against ABC. Thus, Plaintiffs' claim in Count 5 must fail.

### E.   Count 6: Unjust Enrichment Against Agricultural Bank of China

"The essential elements of an action for unjust enrichment are a benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof." *Henry M. Butler, Inc. v. Trizec Props., Inc.*, 524 So. 2d 710, 712 (Fla. 2d DCA 1988). There must be actual damages incurred before a plaintiff can recover for a claim of unjust enrichment. *Prohias v Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1335-36 (S.D. Fla. 2007).

Plaintiffs cannot prevail on their unjust enrichment claim against ABC because it would not be inequitable for ABC to retain the benefit of payment on the letter of credit. The reasons for this are grounded in the law surrounding irrevocable letters of credit. As stated above, "a letter of credit is a separate contract, independent of the underlying obligations or transactions that give rise to its issuance, and that strict adherence to this principle is necessary to protect the integrity of letters of credit as a valuable commercial tool." *In re Prime Motor Inns, Inc.*, 130 B.R. 610, 613 (S.D. Fla. 1991). Thus, whether or not the yacht was actually built, ABC is entitled to demand payment on the letter of credit at anytime, according to its terms. Moreover, the record establishes that ABC has loaned money to FoShan (which FoShan apparently misappropriated by not using it to build the Jaffe yacht), which has not been repaid. Thus, it is equitable for ABC to be paid under the terms of the letter of credit.

Furthermore, Plaintiffs have presented no evidence that ABC engaged in any wrongdoing in this case. ABC was merely asked to loan money to FoShan to finance the building of the yacht, and in return ABC received an irrevocable letter of credit, payable upon demand. Nothing in the record would support Plaintiffs' claim for unjust enrichment, and therefore it must fail.

**F.     Count 7: Civil Conspiracy Against Bank of America & Agricultural Bank of China**

A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy. *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997).

Plaintiffs cannot prevail on their civil conspiracy theory because there is no evidence of any kind to support Plaintiffs' allegations that BoA and ABC entered into an agreement to defraud the Plaintiffs of money they put up to purchase a yacht. As discussed above, ABC merely agreed to loan money to FoShan and in exchange became the beneficiary of the letter of credit issued by BoA. Similarly, BoA was approached by Mr. Jaffe and asked to issue a letter of credit for his yacht construction contract. Jaffe presented BoA with the exact language he wanted in the letter of credit, and BoA executed the agreement with Jaffe, in which the letter of credit was secured by several mortgages on Jaffe's property. BoA acted in complete good faith throughout the entire transaction, and even agreed not to oppose the initial preliminary injunction. Thus, there is simply no evidence of a civil conspiracy, and therefore Plaintiffs' claim in Count 7 must fail.

**V.     CONCLUSION**

Jaffe was apparently the victim of a fraud perpetrated by Allianz, who issued the fraudulent performance bond, and FoShan, who never built the yacht. The Court is sympathetic to the Jaffes' plight. However, neither Allianz nor FoShan is a party to the instant action. Rather, this Court must determine whether the defendants in this case, Bank of America and Agricultural Bank of China, have committed unlawful acts. The evidence adduced at trial demonstrates that they have not.

Accordingly, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1.     The Court finds in favor of both Defendants Bank of America and Agricultural Bank of China on all counts of Plaintiffs' Complaint.

2.     The Injunction issued by this Court on May 3, 2007 (DE #13) enjoining Bank of America from paying the Letter of Credit and continued on September 27, 2007 (DE #85), is hereby **VACATED** and **DISSOLVED.**

3.     Jurisdiction is retained for an adjudication of fees and costs, including such claim, if any, that may be made by Defendants under the terms and conditions of the posted injunction bond.

DONE AND ORDERED in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 18th day of August, 2009.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**

**Counsel for Plaintiff**
Michael T. Moore
Moore & Company
355 Alhambra Circle
Suite 1100
Coral Gables , FL 33134

Scott Andrew Wagner
Moore & Company
355 Alhambra Circle
Suite 1100
Coral Gables , FL 33114

Clay Michael Naughton
Moore & Company

355 Alhambra Circle
Suite 1100
Coral Gables , FL 33134

**Counsel for Defendants**
Peter W. Homer
Homer & Bonner
1441 Brickell Avenue
Four Seasons Tower Suite 1200
Miami , FL 33131


Adam Matthew Shonson
Homer Bonner, P.A.
1441 Brickell Avenue
Miami , FL 33131

Glenn Michael Rissman
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
200 East Las Olas Boulevard
21st Floor (PH-A)
Fort Lauderdale , FL 33301

Jaclyn Dana Goldstein
Hodgson Russ
1801 N Military Trail
Suite 200
Boca Raton , FL 33431

Jacqueline Meyer
Hodgson Russ LLP
60 E 42nd Street
New York , NY 10165

Mark A. Harmon
Hodgson Russ LLP
60 E 42nd Street
New York , NY 10165

Meredith James Gussin
Assouline & Berlowe, P.A.
3250 Mary Street
Suite 308
Miami , FL 33133


S. Robert Schrager

Hodgson Russ LLP
60 E 42nd Street
New York , NY 10165